[No. B003318. Second Dist., Div. One. June 30, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JAMES DOMINICK et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, VI, VIII, XII, and XIII of the Discussion.

## COUNSEL

James A. Goldstein, Dennis L. Cava and Frank O. Bell, Jr., State Public Defender, under appointments by the Court of Appeal, and Richard Avila, Deputy State Public Defender, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Gary R. Hahn and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BOREN, J.***—

### INTRODUCTION

In this consolidated appeal, defendants Michael James Dominick, Steven Michael Romero and Clifton J. Shedelbower raise numerous challenges to the judgments in which each received a sentence of life imprisonment without possibility of parole. We affirm the convictions.

### PROCEDURAL HISTORY

After a severance was granted as to defendant Shedelbower, defendants Dominick and Romero were tried by separate juries in a joint trial. Thereafter Shedelbower waived jury and his case was submitted on various transcripts, including the transcript of the codefendants' trial.

All three defendants were convicted of the first degree murder of Danny H. with special circumstances (witness killing and killing while engaged in flight from commission of rape and other felony crimes) (count I). They were also each convicted of kidnapping (count II), rape (count IV), and oral copulation in concert (count VI). In addition, Dominick was convicted of sodomy (count V) and Romero and Shedelbower were convicted of the attempted murder of Kim M. (count VII), who was the sex crimes victim. Great bodily injury allegations were found true as to Romero and Shedel-

---

*Assigned by the Chairperson of the Judicial Council.

bower on the kidnapping and as to Romero alone on the attempted murder. On that latter charge, Romero was also found to have used a knife. Dominick had not been charged with the attempted murder, and Romero and Shedelbower were acquitted of sodomy. Defendants were also acquitted on various other enhancements allegations.

Each defendant was sentenced to state prison for life without the possibility of parole which sentences were consecutive to determinate sentences of 32 years as to Dominick, 31 years and 8 months as to Romero, and 29 years and 4 months as to Shedelbower.

### FACTS

In the early morning hours of Sunday, November 29, 1981, Kim M., 18 years old, and her 16-year-old friend, Danny H., the murder victim, drove in Kim's Datsun station wagon to a mountaintop location overlooking both the San Fernando Valley and the Saugus/Newhall area. In the vicinity were radar testing facilities operated by ITT Gilfillan Corporation (hereinafter ITT). These facilities had formerly been part of a Nike missile base and included a main facility designated as the Upper Loop Canyon site and another facility containing missile silos at a nearby site called Lower Loop Canyon. ITT employed 24-hour uniformed security guards who made rounds of the facilities in a white van. They operated from a guard house at the main ITT facility.

Kim and Danny parked near the main facility about 3 a.m. and within a few minutes a white van pulled diagonally in front of the station wagon. A man wearing a dark jacket with a fur collar and a badge whom Kim later identified as Romero approached the station wagon and told the couple they were trespassing. After Romero obtained identification from the two, a second man came toward them with a flashlight and asked if they had any weapons. This man wore a green jacket with green pants and spoke with a southern accent. Although Kim testified that Dominick was this man in green, other evidence at the trials showed that he was in fact Shedelbower. According to Dominick's sister, both Dominick and Shedelbower had left her home for the ITT mountaintop facilities very early on that Sunday morning. Shedelbower, who had a southern accent, was then wearing green clothing.[1] Dominick was wearing dark clothing including his fur-collared security guard jacket.

Romero told Kim and Danny to follow him so that he could check them out on "the main computer" to insure they were not spies. The couple then

---

[1] Shedelbower had previously lived in the southern United States, but he told police he had faked a southern accent so the victims would have difficulty identifying him.

followed the white van down to the lower facility with the missile silos where one of the defendants unlocked a gate so the vehicles could be parked inside the fenced compound. A third man, Dominick, whom Kim had not noticed until then, led Danny inside a nearby building. Dominick was dressed in a dark fur-collared security jacket similar to Romero's but displayed no badge.

Shedelbower and Romero, using a flashlight, then led Kim down into what was later determined to be an empty missile silo. As she was being led down some cement stairs, Kim hesitated, and Romero swung a three-foot long white pole or pipe at her. In fear she descended the remaining stairs, arriving in a large room with a cement floor. Her glasses were removed and she was made to undress. Shedelbower then fondled her and forced her to orally copulate him, after which he raped her.

Shedelbower told Romero to "try her out," made degrading remarks to the victim, and taunted her because Kim, who until then had been a virgin, was now bleeding from her genitals. Romero then raped Kim and forced her to orally copulate him.

At about this time, Dominick appeared in the silo and he too forced the victim to orally copulate him. Then he raped her and, following that, turned Kim on her stomach and sodomized her.

Shortly, Shedelbower told Kim she had 30 seconds to get dressed. She was taken outside and placed in the rear of the white van. A few minutes later Shedelbower removed her and placed her in her station wagon. At this time Kim noticed Danny with his head and arms stuck through a ladder leaning against the building he had entered earlier. She could not tell if Danny was tied to the ladder. Romero was standing near him.

Danny was then brought to the station wagon. He was bleeding from the nose and slumped over the steering wheel. Moments later he was made to sit on Kim's lap in the front passenger seat while Shedelbower drove the station wagon down the mountainside with the van leading the way. After approximately 10 or 15 minutes, Shedelbower honked the horn and the van and station wagon stopped. Shedelbower led Danny to the front of the van and Kim heard Romero tell him to "lie down on the ground." Kim saw Romero make striking motions with what appeared to be the white pole she had seen earlier and heard the noise of Danny being struck. Shedelbower, in the meanwhile, was standing beside Kim as she stood near the Datsun on the roadway. She turned her head away from Danny and Shedelbower asked her what she was thinking about. She replied that it was really cold out and they were going to kill her.

Shortly Romero came toward her holding the white pole and stated, "Now its your turn." Shedelbower got behind her and after taking hold of her by her arms, pulled her head back by her hair. As Romero swung the white pole at her in an apparent attempt to "hit [her] throat," she turned her head and screamed and a blow was struck to the right side of her face. At that moment, Kim somehow managed to break free and fell off the roadway part way down the mountainside.

She heard a voice say, "What did you let her go for?" and another voice replied, "She broke free." She heard someone say that they had to find her and then heard someone yell the name "Mike." Testimony at trial indicated that Romero used the first name of Steve, that Shedelbower used the first name of Cliff, and that Dominick used the first name of Michael or Mike. Kim lay on the hillside until one of the three men approached her and felt her arm, apparently for a pulse. She feigned lifelessness and the individual who had found her yelled up the hillside that she was dead and then departed. Moments later she heard voices saying that they would not drag her back up but would push the car off the cliff close to her to make it look as if she had fallen out. She also heard a voice say that Danny was not dead yet and someone else replied that "they were going to kick the son-of-a-bitch to death." She then heard the men say to put Danny in the car and lock the doors. She also heard one of the men say they had "to be back by five." Moments later she heard the Datsun go "over the cliff" and then she could hear the wheels of the Datsun as they spun around after it had come to rest. This was followed by the sound of the van starting up and departing.

Kim lay in the quiet for approximately 15 minutes and assumed that it was close to 5 a.m. The victim then struggled up the side of the mountain arriving on the roadway just as the sun was coming up. She was unable to spot the Datsun station wagon and so started down the roadway half walking and half running.

After about 10 minutes, she heard the sound of an engine and turned to see a white pickup truck coming up from behind. She went over the side of the hill and slipped part way down to hide. She heard one of two men ask if she needed help and then she saw a hand extended over the edge of the roadway to her. Too late Kim, who was still without her glasses, realized to her horror that the two men were Romero and the man in the green clothing (i.e., defendant Shedelbower). Romero had a sharp shiny object with which he stabbed her in the chest three times. She fell backwards partially down the hillside once more. She heard someone yell, "Make sure she's dead this time." She then arose and began running and screaming down the hill further. Near the bottom of that hill she stopped as Romero closed in on her and she asked him, "to let me alone, let me die in peace."

Romero put his arm down and said, "I'd like to but I can't." Kim then became angry and started hitting him. She related that she "reached for his balls" and was "trying to kick him." In this attempt, she fell forward and landed on her stomach. At this point, Romero fell upon her and stabbed her 17 times in the back. Romero left her there bleeding on the ground and she heard the pickup leave.

Kim tried to get up but she had no strength. She lay there until the day became hot when she rolled over into some shade trying to put pressure on her back to stop the bleeding. She used her hands on her chest to stop the bleeding there. Kim lay there all day Sunday, although by Sunday night she had crawled up the hill a little bit to lie under some trees. She was still there Monday, but then managed to crawl halfway up the hill. Her bleeding had stopped and she wrapped her leg around a bush to prevent herself from sliding back down the hill. She also licked some dew off leaves to obtain water.

In the meanwhile when Danny failed to return home by Sunday morning, his father reported him missing to the police. When the police were unable to provide any assistance, he chartered an airplane from which he spotted the wreckage of the Datsun station wagon down a ravine on the mountainside. Fire department personnel and police arrived at the wreckage site at approximately 5 p.m. on Sunday to find only Danny's dead body in the rear cargo area of the Datsun station wagon. The site of the wreckage was approximately two and a half miles from the Lower Loop Canyon ITT facility.

The whereabouts of Kim remained unknown. But by Tuesday night, she had managed to climb back up to the roadway and had begun walking down the mountain. On her own, she arrived on the outskirts of Sylmar and went to a house where assistance was summoned. She was taken by ambulance to Holy Cross Hospital where she remained for approximately two weeks. There she was treated for the 20 stab wounds and for a broken shoulder which she had sustained in falling down the mountainside. Her face was swollen. She suffered from numerous cuts and bruises and one of her lungs had partially collapsed. Dr. Howard Detwiler testified at trial that her stab wounds were life threatening. Dr. Celso Rodriguez further testified that Kim had suffered laceration and rupture of her hymen.

During the ensuing police investigation, detectives found Kim's glasses on an electrical box on the wall of the missile silo room and blood on the cement floor, which upon analysis proved to be of the same type as Kim's. At the missile silo facility, detectives also found both a ladder and a length of rope. Scientific analysis of paint found on the rope matched yellow paint on the ladder. Also blood stains on the rope was found to be the same type

as the blood of Danny. A single strand of hair found on a blood spot on the roadway and hair also found on the rope were compared with hair of Danny and found to have identical characteristics.

A deputy medical examiner performed an autopsy on the body of Danny and ascribed the cause of death to traumatic asphyxiation due to blunt force trauma injuries to the neck. He observed multiple abrasions and lacerations over the head and fractures of the cartilage in the neck. He also noted abrasions and bruises on the victim's hands.

Both Dominick and Romero were employed by ITT as security guards at the former missile base. On Thanksgiving night, three days before these crimes occurred, Shedelbower and Dominick had taken Shedelbower's sister, along with Thanksgiving dinner for Romero, up to the ITT facilities. After meeting at the guard house, all three men had provided a tour of the facilities for Shedelbower's sister and, using a flashlight, had guided her down into the missile silo. That night Romero was wearing a badge on his security guard jacket while Dominick was not.

ITT records showed that Romero worked a solitary shift from 11 p.m. Saturday, November 28, 1981, until 7 a.m. the next morning when he was officially relieved by Dominick. No other ITT employees were at the facilities during that period of time.

Normal procedure for the ITT security guards was to patrol the main facility every hour and the lower site at least every two hours. Romero's handwritten activity log as well as a tape log from a special clock used by the ITT guards showed that Romero failed to make his routine rounds during the period from 3 a.m. until 5:05 a.m. and that the only time he recorded a security check of the lower site was at 6:30 a.m.

After the crimes were committed, ITT employees were unable to find a white closet pole, approximately three feet in length, which had been kept for months by the security guards for use against rattlesnakes.

While she was still being treated in the hospital, Kim identified Dominick and Romero from two photo lineup cards of six photographs each. Subsequent to Shedelbower's arrest, Kim was also shown a videotape of a live lineup conducted at the county jail. She pointed out Shedelbower and another man as possibly being the third assailant. She further indicated that she thought number four (Shedelbower) had had his hair cut. The manager of the apartments where defendant Shedelbower lived, testified that immediately after the date of the crimes and before his arrest, defendant Shedelbower had cut his long hair.

Upon being taken into custody on December 3, 1981, Shedelbower provided detectives with a lengthy narrative account of his and his codefendants' sexual assaults of Kim and the murder of Danny. The knife which was used to stab Kim was obtained by officers from Shedelbower's apartment as the result of his confession.

While in jail, Dominick detailed to another inmate, Steven Copeland, an account of the crimes.

#### DEFENSES

None of the defendants testified. All three relied on evidence of misidentification and Dominick and Shedelbower presented evidence of diminished capacity by reason of drug intoxication. Romero also relied on evidence of nonviolent character.

#### DISCUSSION

#### I, II*

· · · · · · · · · · · · · · · · · · · · · · · · · · · ·

#### III

#### Admissibility of Shedelbower's Confession

■ Shedelbower contends that his recorded confession was introduced into evidence in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] as interpreted by the California Supreme Court in *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], and *People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887]. ■ The California standard is that once a person in custody has refused to waive his right to remain silent, all further attempts at police interrogation must cease. Even if the suspect is readvised of his *Miranda* rights and waives them, his subsequent statements are inadmissible unless the suspect himself voluntarily initiated the

---

*See footnote, *ante*, page 1174.

subsequent statement. (*People* v. *McClary* (1977) 20 Cal.3d 218, 226 [142 Cal.Rptr. 163, 571 P.2d 620].)[8]

■ After defendant Shedelbower was brought to the local sheriff's station in the early evening of December 3, 1981, he was advised of his *Miranda* rights from a card. Shedelbower does not question the adequacy of this advisement nor of the subsequent reading of *Miranda* rights. After waiving these rights, Shedelbower gave a narrative concerning his whereabouts during the early hours of November 29, 1981, a narrative that lasted approximately three-quarters of an hour. In the course of the narrative, Shedelbower admitted that he was up at the ITT facility on the mountain during the hours in question in the presence of Dominick. At the conclusion of this conversation, Shedelbower stated that he "was scared . . . about seeing bloody people. I was afraid they would turn on me afterwards. I don't know what possessed me to get involved with it." He also said something "about a knife or knifing people" and then said, "I think I should call an attorney." Investigators advised Shedelbower that if he wanted an attorney present at that hour he would have to call a private attorney or he could wait until his arraignment when a public defender would be appointed. This was around 8 p.m.

As the investigators began picking up their notebooks and other materials in preparation to leave the interview room and take defendant to the booking area, Detective Smith told Shedelbower that the victim of the stabbing had identified his picture as one of the persons who had raped her and murdered her friend and further told Shedelbower that Dominick was in custody. While it was true that Dominick was in custody, the stabbing victim had not yet seen any photographs of Shedelbower.

After approximately five minutes had elapsed since he had indicated a need for an attorney, Shedelbower then told the officers, "that he had to tell us" and that "he wanted to talk about the case and he did not need any attorney present." The officers replied, "that he had invoked his right to an attorney and that we could not speak with him." Shedelbower responded that "he had to tell somebody."

The officers nonetheless departed and spoke with the prosecuting attorney in this case about what to do. About 9 p.m. (approximately an hour after they had left Shedelbower), they met with him again, readvised him of his *Miranda* rights and after a waiver (which is not of itself contested here)

---

[8]Since this case arose prior to the enactment of Proposition 8, we necessarily resolve this issue based on California law. (See *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149]; *People* v. *Navarez* (1985) 169 Cal.App.3d 936 [215 Cal.Rptr. 519].)

tape recorded defendant's confession. No promises of leniency or threats were made.

The testimony of the sheriff's deputies concerning Shedelbower's statements is uncontradicted. The trial court allowed Shedelbower's confession into evidence, finding that the officer's statement to Shedelbower did not constitute a continuing interrogation and noting that the police may use a ruse in their interrogation, including that the defendant has been identified.

■ On review of the trial court's decision, it is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion that Shedelbower voluntarily initiated the second conversation was a proper one. (*People* v. *McClary, supra,* 20 Cal.3d 218, 227.)

■ Our examination of the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation" (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041])—leads us to the conclusion that the second tape recorded interview was voluntarily initiated by Shedelbower. The officers made no offers of leniency nor intimated any favoritism toward the accused nor made any threats toward him. The investigators' comment that they thought Shedelbower was lying appears to have been in response to his confused statement about seeing bloody people and having been in fear. Inasmuch as the officers had in the earlier interview told Shedelbower that he was not under arrest, it appears that they felt obliged to inform him why he was now going to be held in custody. Thus, they informed him that Dominick was already in custody and further told him that the surviving victim had identified him from photographs, something the officer knew was not yet true. We do not find these comments to constitute interrogation, nor, in the circumstances of this case, to be a form of subtle softening up. (See *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 158-160 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Patterson* (1979) 88 Cal.App.3d 742, 750-752 [152 Cal.Rptr. 183]; *People* v. *Munoz* (1978) 83 Cal.App.3d 993, 996-997 [148 Cal.Rptr. 165].)

■ The United States Supreme Court has defined interrogation as police conduct which reflects "a measure of compulsion above and beyond that inherent in custody itself." (*Rhode Island* v. *Innis* (1984) 446 U.S. 291, 300 [64 L.Ed.2d 297, 307, 100 S.Ct. 1682].) That court has held that interrogation may be police conduct which is the "functional equivalent" of express questioning, including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Id.,* at p. 301 [64 L.Ed.2d at p. 308].) Our California

Supreme Court has further held that interrogation includes any "process of inquiry that lends itself, even if not so designed, to eliciting damaging statements." (*People* v. *Pettingill, supra,* 21 Cal.3d 231, 244.)

In the instant circumstances, Shedelbower had already admitted being present at the crime scene with Dominick and had told the officers that he had seen bloody people and had been in fear. The investigators had already begun the process of having photo lineups shown to the victim by other officers and surely it was in the minds of both the investigating officers and Shedelbower that identification would be soon forthcoming. That the officers who were in the process of gathering up their materials to depart were not seeking a response from defendant is borne out by the fact that after he told them that he had changed his mind and "wanted to talk about the case and he did not need an attorney present," the detectives told him that "we could not speak with him" since he had invoked his right to an attorney. The defendant nonetheless stated, "He had to tell somebody." Nevertheless, the detectives did not seize upon this statement but rather departed to enquire of the district attorney whether or not they should proceed with taking a statement. Thus, it appears that if the investigating officers had designed to elicit a change of heart from defendant, they would have recommended the interview immediately.[9]

This case bears strong similarity to the circumstances in *People* v. *Hayes* (1985) 169 Cal.App.3d 898, 906-909 [215 Cal.Rptr. 595]. In that case, after the accused stated, "I want to talk to a lawyer," the officer explained to him that he was going to have to book him for first degree murder, that he would be sent to juvenile hall where he would be detained and that he was going to get the defendant certified as an adult. As the officer began to depart, the defendant stated "You can't do that to me" and "he hadn't killed anybody and for me to come and go with him and he would show me where the gun was." (*People* v. *Hayes, supra,* at pp. 906-907, fn. 4.) In that case, the accused was a juvenile whereas here the defendant was an adult. In *Hayes* the accused was told he would be certified as an adult.

---

[9]We recognize that the knowledge or intent of the officer is not the controlling factor. (See *People* v. *Pettingill, supra,* 21 Cal.3d 231, 250, fn. 11.) However, that factor may be examined with all other circumstances in evaluating the voluntariness of a waiver. (*People* v. *Honeycutt, supra,* 20 Cal.3d 150, 159.) In *Rhode Island* v. *Innis, supra,* 446 U.S. 291 [64 L.Ed.2d 297], a police officer remarked to the accused, "It would be too bad if [a little girl] . . . would pick up the gun, maybe kill herself." (*Id.*, at p. 295 [64 L.Ed.2d at p. 304].) The accused thereupon disclosed the location of the discarded shotgun. In upholding the admissibility of this evidence, the United States Supreme Court stated: "The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response." (*Id.*, at p. 303 [64 L.Ed.2d at p. 309].)

Here the officers did not attempt to engage defendant in a conversation but merely offered him justification for retaining him in custody. Their words do not appear to us to be "reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island* v. *Innis, supra,* 446 U.S. 291, 301 [64 L.Ed.2d 297, 308]; see also *People* v. *Sanchez* (1983) 148 Cal.App.3d 62, 70 [195 Cal.Rptr. 558], and *People* v. *Owens* (1980) 106 Cal.App.3d 23, 25-28 [165 Cal.Rptr. 15].)

In *People* v. *Hayes, supra,* at page 907, the detective told the defendant that he, the detective, "couldn't talk with him." In the instant case, the detective told defendant that "we could not speak with him." It was then that Shedelbower said, "he had to tell somebody." That statement viewed in conjunction with the fact defendant had had an additional hour to reconsider prior to waiving his so-called *Miranda* rights, convinces us that Shedelbower voluntarily initiated the second interview and that nothing more than the fact of custody and the desire to mitigate his circumstances motivated his giving of the latter statement.

That a portion of the comments made by Detective Smith was false does not compel a different construction of the facts. Whether or not the detective's statement was false does not in any way change the actuality of the defendant's state of mind with respect to voluntariness. It has been held that the use of subterfuge by police investigators is not necessarily impermissible because "subterfuge per se is not the same as coercive conduct." (*People* v. *Parrison* (1982) 137 Cal.App.3d 529, 537 [187 Cal.Rptr. 123]; *People* v. *Felix, supra,* 72 Cal.App.3d 879, 885 [139 Cal.Rptr. 366].)

Shedelbower's further contention that the detective misled him as to the availability of the services of the public defender, by stating that the public defender would not be available until his arraignment in the morning, is without merit. On appeal, defendant asserts that "he evidently did not have the money to have private counsel to help him." No evidence was presented to the trial court in this regard nor in regard to whether or not a public defender was available that evening or not until the morning. The record does not show this information to be misleading.

We thus hold that Shedelbower's tape recorded confession was self-initiated and obtained only after a voluntary waiver of his so-called *Miranda* rights. The trial court's admission of the statement was proper.

IV

Jury Selection

 Citing the California Supreme Court decision in *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], defendant Dom-

inick contends that the prosecutor used his peremptory challenges to systematically exclude all minorities from the jury. (Cal. Const., art. I, § 16.) He urges that his right to trial by jury was violated thereby.

■ Our Supreme Court in *Wheeler* recognized that "in any given instance the presumption must be that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground." (*People* v. *Wheeler, supra,* at p. 278.) That court held that in order to advance a claim of unconstitutional, discriminatory exclusion, a defendant "must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group . . . . Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Id.,* at p. 280, fn. omitted.)

The defendant may demonstrate systematic exclusion by showing that: (1) the prosecutor has excluded all or most of an identified group from the venire; (2) he has used a disproportionate number of peremptory challenges against the members of this group; or (3) the jurors in question have only their group identification in common; or (4) apart from their group identification they are as heterogeneous as a community as a whole. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 280.) Only if the defendant makes a prima facie case does the burden shift to the prosecution to show that the peremptory challenges were not predicated on group bias alone. (*Id.,* at p. 281.)

■ The 12 jurors in this case were selected and sworn after the prosecution had exercised 18 peremptory challenges and the defense 13. Only after selection of five alternate jurors had commenced and the People had exercised two peremptory challenges and the defense one did counsel for Dominick raise the issue of discriminatory exclusion.[10]

During this selection of the alternate jurors, the People used their second peremptory challenge to excuse Mr. Neil. At this point, defense counsel raised its objection "to the striking of Mr. Neil" on the basis that the prosecution had now "struck each and every black person that has been called to sit on the jury, Mrs. Wright and Mrs. Charles and now Mr. Neil." Defense counsel then stated that the prosecutor had "for good measure

---

[10]We observe that defendant's specific objection was merely "to the striking of Mr. Neil," who was one of the prospective alternate jurors. The People have not raised the issue of the timeliness of a motion brought pursuant to *People* v. *Wheeler, supra,* 22 Cal.3d 258, 280. Nor do we need to reach that issue in light of our conclusion that the defendant has failed to make a prima facie case as required by the *Wheeler* decision.

struck Mrs. Zambrano, Mrs. Caldera, the only two hispanics who sat on the jury" as well as Mr. Christensen and Mr. Fong. Counsel told the court that the prosecution had "struck each and every minority person, black, hispanic or native American who sat on the jury. And for good measure, he struck Mr. Fong."[11] Counsel urged that the People had used their peremptories in a discriminatory fashion.

The court did not call upon the prosecutor to justify his use of the peremptories in question. Rather, the court stated that it had been observing jury selection with this constitutional issue in mind and was of the "impression" that none of the jurors "were being excused merely because of the fact they were of a particular ethnic background." The court then went on to enumerate facts derived from the voir dire concerning Mr. Neil, Mrs. Caldera, and Mrs. Wright. The court further stated that "in each and every case that I can recall, it appeared to me that there was some sort of a justification for his requesting that they be excluded." The trial court conceded that defendant need not be a member of a minority group in order to raise the objection but observed that such a factor was one "that's put into the overall picture." The court held that there "has not been a systematic exclusion of minorities from the Panel."

By not calling upon the prosecuting attorney to state reasons for his exercise of peremptory challenges, the court in effect held that defendant had not to the satisfaction of the court made a prima facie case of group discrimination by peremptory challenges. We so hold.

With reference to three additional cases cited on this issue by defendant, we observe first of all what this case is not. It is not a case where the prosecutor simply elected to exercise a blanket challenge against minority jurors because certain prosecution witnesses had made racially prejudicial statements that might be disclosed to the jury. (*People* v. *Johnson* (1978) 22 Cal.3d 296 [148 Cal.Rptr. 915, 583 P.2d 774].) In fact, race could not be an issue in this case except perhaps as to defendant Romero. The victims were White as were Dominick and his friend Shedelbower. There simply are no "race factors" as in *People* v. *Fuller* (1982) 136 Cal.App.3d 403, 419 [186 Cal.Rptr. 283].[12] Nor is this a case where the prosecutor addressed

---

[11]The court seemed surprised by the defense counsel's assertion that Mr. Christensen was native American Indian. Other than a reference to the fact that Mr. Christensen, while attending Brigham Young University, was a person who could have been referred to as a "laymanite" [*sic*], the record is silent on the subject.

We assume Mr. Fong to be Oriental on the basis of his surname. (See *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719].)

[12]Defendant also cites the case of *People* v. *Superior Court* (*Jarrett*) (Cal.App.). That case has been depublished by order of the California Supreme Court and so we do not take cognizance of it.

only perfunctory questions, desultory questions or no questions at all to the jurors in question. (*People* v. *Allen* (1979) 23 Cal.3d 286, 291, fn. 1 [152 Cal.Rptr. 454, 590 P.2d 30].)

We have independently examined the entire record concerning jury selection in this case and agree with both the trial court and the Attorney General that this record amply evidences "independent grounds" for the peremptory challenges in question. (See *People* v. *Fuller, supra,* 136 Cal.App.3d 403, 423.)[13]

The instant case bears similarity to the facts in *People* v. *Rousseau* (1982) 129 Cal.App.3d 526 [179 Cal.Rptr. 892], where the Court of Appeal upheld the trial court's determination that the defense had failed to meet its prima facie burden. The prosecution in that case had exercised two peremptory challenges against the only two Blacks on the panel. The attempt to satisfy the prima facie case requirement was limited to the statement that "'there were only two blacks on the whole panel, and they were both challenged by the district attorney.'" (*People* v. *Rousseau, supra,* at p. 536.) From all the circumstances of the instant case, including the fact that neither Dominick

---

[13]Our examination of the record showed that the prosecuting attorney carefully examined all prospective jurors including the ones in question here. Although on this record we cannot with certainty pinpoint the reasons the prosecuting attorney had for his peremptory challenges, we need not ignore the considerations commonly observed in our trial courts which lead to use of peremptory challenges.

For example, Mr. Fong, who was a post office clerk, was hesitant and somewhat non-responsive during the voir dire on the death penalty subject. He also had a mentally disturbed brother and seemed somewhat concerned with the issue of the age of the defendants.

Mrs. Zambrano, when questioned about the death penalty, was "kind of fazey [*sic*] on that."

Mrs. Wright indicated she would have great difficulty imposing the death penalty on a defendant of 23 years of age and initially indicated she would require a rape victim to have struggled in order to convict.

Mr. Christensen, the apparently native American Indian, was a bachelor whose principal interest was in motorcycles. There was some indication he was somewhat estranged from his family and he had difficulty offering any opinion with respect to the death penalty and stated that it was "hard to deal with."

Mrs. Charles was an unemployed divorcee with three children who had quit her last job after only three months and who stated that she did not know if she could impose the death penalty.

Mrs. Caldera admitted that she was upset by the charges in the case and further stated that she thought the death penalty stemmed from overcrowding in the prisons. She was equivocal in her answers about the death penalty and told the court that her brother had "just got out" of the county jail on charges of drug possession. She also told the court that her husband had been a Los Angeles police officer for approximately a year but had been dismissed because of an off-duty altercation on which he was now going to court.

Mr. Neil stated as to the death penalty, "I don't know" and "I just couldn't make a decision." He stated that he could think of no circumstances under which he would impose the death penalty. He also stated that he was a therapist dealing with social and emotional problems and that he had degrees in sociology and psychology. These voir dire responses by these jurors are grist for the exercise of peremptory challenges in a constitutional manner.

nor the victims were members of any cognizable minority group, we find that the defendant clearly failed to "show a strong likelihood" that the jurors in question were "challenged because of their group association rather than because of any specific bias." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 280.) Thus, as in the *Rousseau* case, we uphold the trial court's implied determination that the defense failed to meet its burden.

## V

### Motion to Exclude Identification Testimony

■ Defendant Shedelbower contends that the trial court erred in denying his motion to exclude identification testimony by the surviving victim. He asserts that the circumstances of a videotape lineup were so impermissibly suggestive as to taint the in-court identifications at the preliminary hearing and trial, rendering them inadmissible. (See *United States* v. *Wade* (1967) 388 U.S. 218, 224 [18 L.Ed.2d 1149, 1156, 87 S.Ct. 1926]; *Stovall* v. *Denno* (1967) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967].) We have examined "the totality of the circumstances" (*Stovall* v. *Denno, supra,* at p. 302 [18 L.Ed.2d at p. 1206]) and hold that Shedelbower has failed to satisfy the requirement of demonstrating unfairness in the identification procedure such as will support his claim that he was denied due process. (*People* v. *Hunt* (1977) 19 Cal.3d 888, 893 [140 Cal.Rptr. 651, 568 P.2d 376].)

Approximately a day and a half after Shedelbower was arrested, the surviving victim, Kim, was shown a videotape recording of a live lineup of six persons conducted at the Los Angeles County jail. Upon viewing the videotape from her hospital bed, the victim responded to the investigators that "four and six look pretty familiar [and] . . . four's hair looks a little longer." Number four was Shedelbower.[14] Shedelbower makes no complaint that the actual live lineup itself was somehow suggestive and indeed the record does not indicate such. Since the videotape itself was preserved as were the particular comments of the victim upon viewing it, we perceive no denial of due process in this identification procedure. The trier of fact, here the trial court, had all the necessary facts with which to gauge the victim's in-court identification testimony. Furthermore, contrary to defendant's assertion that the police investigators told the victim "that one of the suspects was 'probably' in the line-up," testimony at the preliminary hearing was that the investigator stated that one or more of the suspects "might" be in the lineup.

---

[14]At the trial of Dominick and Romero and at the preliminary examination for all three defendants, Kim testified that she meant that number four's hair had been cut since the time of the crime. That was precisely the testimony of Shedelbower's apartment manager.

We agree with the decision in *People* v. *Prado* (1982) 130 Cal.App.3d 669, 673-674 [182 Cal.Rptr. 129], that the positive, in-court identification of a defendant by an assault victim need not be excluded merely because the victim has previously failed to make a positive identification from a photographic display as a videotape lineup in essence is. ██ ██ ██ These circumstances do not amount to an impermissibly unfair one person showup. (*Id.*, at p. 673.)[15]

 Moreover, even if it were error to admit the identification testimony, it was certainly on the facts of this case harmless beyond a reasonable doubt, under the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *Martin* (1970) 2 Cal.3d 822, 831 [87 Cal.Rptr. 709, 471 P.2d 29].) The testimony of Dominick's sister and her boyfriend clearly established that Shedelbower departed with Dominick for the ITT facility remotely located on the mountaintop. The surviving victim had picked out both Dominick and Romero's photographs from two separate photographic lineups. Her description of the clothing of the three men when coupled with the identifications of Dominick and Romero and the testimony of Dominick's sister and her boyfriend, clearly established that Shedelbower was the third man among the three culprits. Furthermore, the prosecutor did not dispute that Kim's identifications were somewhat mixed-up. She had Dominick's clothing on Shedelbower and vice versa and had apparently confused which man did what. Clearly, the in-court identification added little to the case against Shedelbower.

## VI*

### Exclusion of Identification Expert

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## VII

### Confession to Jail Inmate

 Defendant Dominick next contends that his conviction should be reversed because statements he made in the county jail to Steven Copeland

---

[15]In citing the United States Supreme Court decision in *Moore* v. *Illinois* (1977) 434 U.S. 220 [54 L.Ed.2d 424, 98 S.Ct. 458], counsel on appeal for Shedelbower toy with the issue of lack of counsel for Shedelbower at the videotaped lineup procedures. Although this issue was not directly raised in the trial court which ought to preclude raising it now, it clearly appears to us that such a procedure is one of photographic identification. And it is settled that there is no right to counsel at a photographic identification procedure in part because the evidence of the procedure (i.e., the photograph or the videotape) is preserved for both a trier of fact and a reviewing court. (*People* v. *Rist* (1976) 16 Cal.3d 211, 216-217 [127 Cal.Rptr. 457, 545 P.2d 833].)

*See footnote, *ante,* page 1174.

were obtained in violation of the principles stated in *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]. He claims those statements should have been suppressed on the ground that Copeland was a paid government agent who deliberately elicited statements from him.

The United States Supreme Court's decision in the *Henry* case and its decision in *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], rest on Sixth Amendment principles concerning interference by governmental agents with an accused's right to counsel. These cases hold that the government cannot use a paid informant to "deliberately elicit" incriminating information from a defendant who is under indictment and in custody, and who has no reason to know that his ostensible fellow inmate is a paid agent for the government. (*United States* v. *Henry, supra,* 447 U.S. 264, 270 [65 L.Ed.2d 115, 122].)

Copeland had been a reliable informant concerning street narcotics activity for the California State Bureau of Narcotic Enforcement, Los Angeles County Sheriff's Department, and the Monrovia Police Department. Nonetheless, he had managed to get himself returned to prison and then, at the time of the events in question here, was serving a six-month county jail term. He was a "trusty" for a module in the Los Angeles County Central Jail which housed both informants and "softs," persons whose immature physical appearance made them targets for abuse by other inmates in the general population. Dominick was placed in the module on December 4, 1981, because he appeared to be a "soft." On that date, Copeland was instructed by a Sheriff's deputy to explain to the newly arrived inmate, Dominick, the "ropes" or basic procedures concerning jail clothing, telephones, etc.

A month or so earlier, Copeland had called from the county jail and made contact with District Attorney Investigator Gary Schram with whom he had had previous dealings. Schram had no connection with the investigation of the crimes in this case. During the ensuing conversation with Schram at the county jail, Copeland "very vaguely" spoke about receiving "some kind of consideration as to sentence" if he came "across something while he was in the county jail." Copeland stated that if he did come across anything, he would give the investigator a call. The investigator told him to "stay in touch" but at no time instructed him to seek out any information from inmates concerning criminal activity and never paid him any money to act as a listening post while in the jail although prior to this jail term Copeland had been paid money as an informant. Likewise, no one from the State Bureau of Narcotic Enforcement or the sheriff's department instructed Copeland to make contact with Dominick or any other jail inmate.

The record reflects that at trial Copeland testified that in his initial conversation with Dominick, the latter was "quite upset and distraught" and that Copeland's "curiosity was genuinely aroused." Copeland had two additional conversations with Dominick, the first while both were on their way to meet visitors in the jail and the second in the day room where they were watching television. After the last conversation, Copeland made notes about the conversation using a type of code. Then he contacted Investigator Schram who put him in contact with the investigating officer assigned to the instant crimes, this occurring on December 8, 1981. Copeland offered to provide the information if conditions were met concerning his sentence and payment of money. Eventually, he received $300 and 30 days off his sentence. Dominick's final conversation in the day room amounted to virtually a full confession of his role in the murder and sexual assaults.[17]

There is no evidence in the instant record supporting Dominick's contention that Copeland was acting on instructions from law enforcement officials to "deliberately elicit" incriminating information from Dominick or from any other county jail inmate. Dominick's confession appears to have been spontaneous and voluntary. (See *People* v. *Talamantez* (1985) 169 Cal.App.3d 443, 463-464 [215 Cal.Rptr. 542]; *People* v. *Moore* (1985) 166 Cal.App.3d 540, 545-547 [211 Cal.Rptr. 856].)[18] We conclude that no *Massiah* or *Henry* violation occurred and that Copeland's testimony was properly admitted.

VIII*

Admissibility of Photographs

. . . . . . . . . . . . . . . . . . . . . . .

---

[17]Copeland's testimony was corroborated by the wealth of details he provided concerning the murders, details that could not have been provided by media accounts. For example, Copeland testified that Dominick told him of a rag that had been obtained from the van and placed in the mouth of Danny during the period of time he was being killed. Police investigators had found in the cargo area of the white Chevrolet van a blood-stained cloth and laboratory analysis proved the blood to be of the same type as that of Danny.

[18]We note that in *Talamantez* it was held that even an informant who has been engaged to obtain information from other jail inmates relating to narcotics operations in the county jail provides no violation of the *Henry-Massiah* principles. The court observed that the informant was informing "on a different crime from that for which Talamantez was in custody." (*People* v. *Talamantez, supra*, 169 Cal.App.3d 443, 464.) In the instant case, Investigator Schram could have had no connection with the instant crimes since they had not yet even occurred at the time he had his conversation with Copeland.

*See footnote, *ante*. page 1174.

## IX

### Sufficiency of Special Circumstances Evidence

 Defendants Romero and Shedelbower argue that the evidence in their cases cannot sustain the special circumstance allegations found to be true pursuant to Penal Code section 190.2, subdivision (a)(10). That special circumstance involves the killing of a witness for the purpose of preventing testimony where the killing does not occur "during the commission of the witnessed crime."[19]

 Defendant Shedelbower further contends that the evidence likewise cannot sustain the finding of the special circumstance that he and his co-defendants were engaged in immediate flight after having committed the sexual crimes. (Pen. Code, § 190.2, subd. (a)(17).)[20] The defendants claim that these two special circumstances provisions of Penal Code section 190.2, subdivision (a), cannot be applied here. We find otherwise.

 Asserting that the violent crimes against the two victims were part of one indivisible transaction also involving the sex crimes, Romero cites *People* v. *Bigelow* (1984) 37 Cal.3d 731, 752 [209 Cal.Rptr. 328, 691 P.2d 994]. He argues that the only way the Penal Code section 190.2, subdivision (a)(10), witness killing special circumstance can be sustained is by "an unreasonably expansive reading" which would cause that circumstance to overlap with felony-murder considerations. We find the *Bigelow* case and also *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883], also cited by Romero, to be distinguishable. *Bigelow* concerned the special circumstance in Penal Code section 190.2, subdivision (a)(5), where the purpose of the killing is to avoid or prevent lawful arrest or to

---

[19]The allegation in the instant case read as follows: "It is further alleged that the murder of Daniel H. was committed by defendants Michael James Dominick, Steven Michael Romero and Clifton Joseph Shedelbower, and that Daniel H. was a witness to rape in violation of Penal Code section 261, subdivision (2), as alleged in count IV herein, sodomy, in violation of Penal Code section 286, subdivision (c), as alleged in count V herein, and oral copulation in violation of Penal Code section 288a, subdivision (d), as alleged in count V, and that said Daniel H. was intentionally killed for the purpose of preventing his testimony in a criminal proceeding, but that said killing was not committed during the commission and attempted commission of the crimes to which Daniel H. was a witness within the meaning of Penal Code section 190.2, subdivision (a)(10)."

[20]This special circumstance allegation was as follows: "It is further alleged that the murder of Daniel H. was committed by defendants Michael James Dominick, Steven Michael Romero and Clifton Joseph Shedelbower while the defendants were engaged in the immediate flight after having committed and attempting to commit the crimes, in violation of Penal Code section 261, subdivision (2), sodomy, in violation of Penal Code section 286, subdivision (c), and oral copulation, in violation of Penal Code section 288a, subdivision (d), within the meaning of Penal Code section 190.2, subdivision (2)(17)."

perfect or attempt to perfect an escape from lawful custody. (*People* v. *Bigelow, supra,* at p. 751.) The Supreme Court's concern in *Bigelow* was that a broader construction of that section would result in extending the avoiding arrest circumstance to virtually all felony murders. (*Id.,* at p. 752, fn. 13.) However, we do not believe that our holding in this case works an unreasonable extension of the special circumstance so as to overlap with felony-murder considerations.

Clearly, if the victims here had been murdered at the missile silo immediately following the sexual assaults upon Kim, the People could have charged the second special circumstance as a murder committed while defendants were engaged in the commission or attempted commission of the sexual offenses. (Pen. Code, § 190.2, subd. (a)(17)(iii) or (iv) or (vi).) Our ruling thus avoids a gap in the law that, clearly, the electorate did not intend. (*Jones* v. *Superior Court* (1981) 123 Cal.App.3d 160, 173 [176 Cal.Rptr. 430].) The court in *Jones* recognized that its interpretation of paragraph (17) of Penal Code section 190.2, subdivision (a), would "bring many victim transportation cases under this special circumstance. However, the contrary result would create a gap in the special circumstance law for those victim transportations which do not qualify as kidnappings." (*Ibid.*)

The instant case squarely falls within that category since here the accuseds' primary goal was not to kidnap but to kill and thus the kidnapping was merely incidental to the murder and was not committed to advance an independent felonious purpose. (See *People* v. *Weidert* (1985) 39 Cal.3d 836, 842 [218 Cal.Rptr. 57, 705 P.2d 380]; *People* v. *Green* (1980) 27 Cal.3d 1, 47-62 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Thompson, supra,* 27 Cal.3d 303, 321-322.) The court in *Jones* v. *Superior Court, supra,* 123 Cal.App.3d 160, 173, footnote 4, specifically held regarding victim transportation situations that this aforementioned "gap would be filled by section 190.2, subdivision (a)(10) in cases where the person killed was a witness killed to prevent testimony . . . ."[21]

In the instant case, after the sexual assaults had been completed, Kim was made to get dressed and was placed in her own vehicle. Danny was untied and also placed in that vehicle and that car was driven behind the white van to a remote location elsewhere on the mountain. This activity

---

[21]The Court of Appeal in the *Jones* decision clearly anticipated the Supreme Court's decision in *People* v. *Weidert, supra,* and thus correctly perceived the gap which would result in the absence of its interpretation of the special circumstances law as well as ours. (*Jones* v. *Superior Court, supra,* at p. 164, fn. 3.) Similarly, the prosecution here in the proceedings in the trial court anticipated these results and moved to strike the language of subdivision (a) (17) relating to the murder being committed during the commission or attempted commission of the kidnapping or sexual assaults and chose to rely simply on the special circumstances dealing with the witness killing and the "in flight" aspect of subdivision (a) (17).

was clearly separate and apart from the sexual assaults. For a short period back in the missile silo compound, Danny and Kim were left alone. During this period defendants obviously consulted with each other about what to do with the victims. This conclusion is borne out by evidence from the mouth of each defendant. Dominick told Steve Copeland in the jail that at the time victims were placed in the Datsun station wagon, defendant Romero stated, "You know what we have to do now." Shedelbower told the police officers that he told the other two defendants that they ought to just let the victims go. However, he said, Dominick and Romero stated, "No, no, they gotta be done in . . . that they will talk for sure." Finally, Danny was not sexually assaulted nor directly part of those activities inside the missile silo. However, he was circumstantially a witness to those crimes. He was plainly killed to prevent him from being a witness in a criminal proceeding based on those sex crimes.

 In any event, any error in regard to this special circumstance is harmless under the facts of this case because defendants did not receive the death penalty and there is a second special circumstance allegation which must be upheld.

 As to the second special circumstance allegation which was found to be true, this case is "on all fours" with the facts and the holding in *Jones* v. *Superior Court, supra,* 123 Cal.App.3d 160. The victims in that case were likewise a male and female couple. The two defendants there had invaded a house and committed acts of rape and oral copulation upon the female. After conversation between the two defendants, the couple was transported in a station wagon "to a roadside location some two miles distant." As here, the defendants succeeded in killing only one of the two victims and the second (the male) escaped.

The court in *Jones* held, "that the question of whether [the defendants] were engaged in 'immediate flight' from the rape and/or oral copulation should depend not upon whether they took the victims with them but upon their purposes and intentions upon leaving the scene of the crimes. If they were leaving to avoid detection and transportation of the victims would assist in that purpose, the fact that they might have been kidnaping the victims at the same time should not negate their purpose of flight. Even if the transportation is with the intention of killing the victims, it could be part of the immediate flight if the killing itself is to facilitate the flight rather than for some separate purpose. Only if the transportation of the victims away from the initial crime scene were for some purpose other than facilitating avoidance of the detection for the initial crimes would the transportation not be considered 'flight' from commission of the crimes." (*Jones* v. *Superior Court, supra,* 123 Cal.App.3d at pp. 172-173.) The court further

concluded that in their view "the phrase 'immediate flight after' commission should not be held inapplicable merely because the victims accompanied [defendants] during flight." (*Id.,* at p. 173.)

Similarly, we conclude that though defendants obviously intended to go back to the main ITT facility on the mountain (the guard house location), they did leave the missile silo and did transport the victims away from the missile silo for the express purpose of "facilitating avoidance of the detection for the initial crimes." (*Ibid.*) The record shows that the location where Danny was killed was approximately two and a half miles from the missile silo, a distance which on that road took approximately ten minutes to drive. We hold, as in the *Jones* case, that the evidence herein clearly supports a finding that the killing of Danny was perpetrated while the defendants were in "the immediate flight after committing" rape, sodomy, and oral copulation on the surviving victim. (Pen. Code, § 190.2, subd. (a)(17).)

X

Jury Instructions

Defendants Dominick and Romero contend that the trial court committed reversible errors in failing to adequately instruct the jurors on intent as required by the California Supreme Court in its decisions in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 139-154 [197 Cal.Rptr. 79, 672 P.2d 862] and *People* v. *Beeman* (1984) 35 Cal.3d 547, 560-563 [199 Cal.Rptr. 60, 674 P.2d 1318]. We hold that the trial court did not commit *Beeman* error and that the *Carlos* instructional error is nonprejudicial.

The Supreme Court in the *Beeman* decision found that the standard aiding and abetting instructions (CALJIC 3.00 and 3.01) inadequately defined aiding and abetting and failed "to ensure that an aider and abettor will be found to have the required mental state with regard to his or her own act." (*People* v. *Beeman, supra,* at p. 560.) The court held that "the aider and abettor must share the specific intent of the perpetrator" and explained that "an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Ibid.*)

The trials in the instant case occurred prior to the rendering of the decisions in *Beeman* and *Carlos*. Nonetheless, both of those decisions apply to the instant case as the Supreme Court has expressly ruled them retroactive. (*People* v. *Croy* (1985) 41 Cal.3d 1, 12 [221 Cal.Rptr. 592, 710 P.2d 392]

(*Beeman* error); *People* v. *Garcia* (1984) 36 Cal.3d 539, 549 [205 Cal.Rptr. 265, 684 P.2d 826] (*Carlos* error).)[22] In apparent anticipation of a Supreme Court ruling similar to *Beeman,* the trial court did not give CALJIC 3.00 and CALJIC 3.01 in their exact 1981 revision form. Instead, the court modified each of those instructions to require that the jury find as to any aider and abettor that he "shares in the perpetrator's intent," exactly the requirement specified by the Supreme Court. (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560.)[23] Since, under this instruction, the aider and abettor had to have the same intent as the perpetrator, the aider and abettor could not be a person who, merely " 'knowing of the perpetrator's unlawful purpose, negligently or accidentally aided the commission of the crime' (*People* v. *Patrick* (1981) 126 Cal.App.3d 952, 967, fn. 10 [179 Cal.Rptr. 276])." (*People* v. *Beeman, supra,* at p. 560.) Hence, the problem *Beeman* sought to correct does not exist in the instant case,[24] and there was no *Beeman* error.

 Because the trial court gave the aiding and abetting instructions that it did, the asserted *Carlos* error was clearly nonprejudicial.

---

[22]The Supreme Court stated in its opinion that they "suggest that an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People* v. *Beeman, supra,* at p. 561.) The current version of CALJIC 3.01 is worded in accordance with that suggestion.

[23]This instruction went beyond that which had been requested by the defendant in *Beeman* and which was suggested by the appellate decision in *People* v. *Yarber* (1979) 90 Cal.App.3d 895, 916 [153 Cal.Rptr. 875], which was as follows: "[A] person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator [of the crime], he *intentionally* aids, promotes, encourages or instigates by act or advice the commission of such crime." (Italics in original; fn. omitted.)

[24]As modified by the trial court, CALJIC No. 3.00 (1981 rev.) was given as follows: "The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include: [¶] 1. Those who directly and actively commit or attempt to commit the act constituting the crime, or [¶] 2. Those who, with knowledge of the unlawful purpose of the person who directly and actively commits or attempts to commit the crime, aid and abet in its commission or attempted commission, and shares in the perpetrator's intent, (or) [¶] 3. Those who, whether present or not at the commission or attempted commission of the crime, advise and encourage its commission or attempted commission, and share in the perpetrator's intent. [¶] One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged, and shared in the perpetrator's intent."

CALJIC No. 3.01 (1980 rev.) was given by the trial court, modified as follows: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime, and shares in the perpetrator's intent. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

The Supreme Court has concluded that failure to instruct on intent in accordance with the *Carlos* decision requires reversal in all cases unless one or more of four exceptions are present. These are described and summarized in *People v. Garcia, supra,* 36 Cal.3d 539, 549-558 and *People v. Ramos* (1984) 37 Cal.3d 136, 146-147 [207 Cal.Rptr. 800, 689 P.2d 430]. We have examined the third of those exceptions and find that it applies in the context of this case. This third exception is based on the Supreme Court's explanation in *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], that "in some circumstances it is possible to determine that although an instruction . . . was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant . . . ." (See *People v. Garcia, supra,* 36 Cal.3d at p. 555.)

The defendants in *Carlos* and *Garcia* were each found guilty of first degree murder with special circumstances based on felony-murder instructions where a codefendant was the actual killer. In *People v. Montiel* (1985) 39 Cal.3d 910 [218 Cal.Rptr. 572, 705 P.2d 1248], the California Supreme Court had occasion to consider *Carlos* error in the context of a single defendant felony-murder case where the defendant admitted being at the scene of the crime, denied actual commission of the crime, and relied on a showing of drug intoxication. The Supreme Court held that since the jury had found true the special circumstance that "'the murder was intentional and carried out for financial gain,'" and the jury had been "required to find that the 'murder was intentional . . .,'" the so called *Sedeno* exception applied and made "reversal under *Carlos* unnecessary." (*People v. Montiel, supra,* at pp. 926-927, fn. omitted.)

The respective juries of Dominick and Romero were not instructed as to felony murder or as to implied malice. Rather, each jury was given instruction on specific intent and malice aforethought as the mental state required for a murder conviction. Each jury was also given CALJIC No. 8.20 (4th ed. 1979) which told the jury that "[a]ll murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree." That instruction further defined willful as meaning "intentional." On the instruction defining malice aforethought (CALJIC No. 8.11 (4th ed. 1979)), the court deleted the language concerning implied malice and instructed the jury that "[m]alice is express when there is manifested an intent unlawfully to kill a human being." In addition to receiving all of the foregoing instructions, each jury was also instructed as to unpremeditated murder of the second degree for which was also required "malice aforethought when there is manifested an intention

unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation.''

Dominick's jury, however, received additional instructions on homicide as follows: (1) voluntary manslaughter defined as ''the intentional and unlawful killing of a human being without malice aforethought'' (CALJIC No. 8.41 (4th ed.)); (2) involuntary manslaughter as ''the unlawful killing of a human being without malice aforethought and without an intent to kill'' (CALJIC No. 8.48 (4th ed.)); (3) diminished capacity concerning reasonable doubt as to whether the defendant formed a ''an intent to kill'' (CALJIC No. 8.77 (4th ed.)); and (4) voluntary intoxication as it related to the ''necessary element . . . in the mind of the defendant of the specific intent [unlawfully to kill a human being and a] mental state of [malice aforethought].'' (CALJIC No. 4.21 (4th ed. 1986 pocket pt.)).

The jury in each case found the defendant guilty of first degree murder. To so convict, the jurors necessarily found that the murder was intentional and that each defendant ''manifested an intent unlawfully to kill'' the victim. (CALJIC No. 8.11 (4th ed.).) Moreover, in so convicting, Dominick's jury necessarily rejected involuntary manslaughter, voluntary intoxication and diminished capacity (i.e., the jury found no lack of an intent to kill). Since both juries likewise received the aiding and abetting instructions (CALJIC Nos. 3.00 and 3.01), if we assume either jury decided its defendant was an aider and abettor, they necessarily also decided that he shared in the actual perpetrator's intent.

Furthermore, each jury was instructed on the special circumstance of murder of a witness to a crime. The jury had to find that ''the witness was intentionally killed'' (CALJIC No. 8.81.10 (4th ed.)). Again, taken in conjunction with the aiding and abetting instructions, it is clear that each jury necessarily found an intention to kill. Our view parallels that of the California Supreme Court in *People* v. *Montiel, supra,* 39 Cal.3d 910, 926, where as to a murder for financial gain special circumstance, our high court noted that the jury was ''required to find that 'the murder was intentional.''' Based on that wording of the instruction as well as other factors in the case, the Supreme Court concluded that the *Sedeno* exception applied ''making reversal under *Carlos* unnecessary.'' (*Id.,* at p. 927.) We likewise so hold and find there was no prejudicial error in failing to instruct in the precise language of *Carlos.*

■ Defendant Shedelbower also claims that the special circumstances must be set aside as to him for failure of the trial court to specifically find that he had acted with intent to kill. This is essentially a challenge to the sufficiency of the evidence. (*People* v. *Scott* (1985) 173 Cal.App.3d 937,

940-942 [219 Cal.Rptr. 322]; *People* v. *Leigh* (1985) 168 Cal.App.3d 217, 220-221 [214 Cal.Rptr. 61].)

We apply the familiar substantial evidence test as to the entire record on appeal to determine whether a reasonable trier of fact could have found the special circumstance to be true beyond a reasonable doubt. In applying this test, the court must review the whole record in the light most favorable to the judgment below (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]) and presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) If the trial court findings are justified by the circumstances, an appellate court cannot reverse merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People* v. *Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659].)

In his December 3, 1981, statement to the police, Shedelbower told the officers that before he drove the victims in the Datsun station wagon to the isolated spot where Danny was killed, the other two defendants said that the victims "gotta be done in" and "that they will talk for sure." He further told the police that he followed his codefendants' instructions to stay with the girl while they took the boy and "commenced beating him in the head with a stick." Then they came back, according to Shedelbower, and told him "just to grab the girl by the hair and hold her head up." He stated that he did so while Dominick hit her in the face just before she fell off the side of the mountain. In addition, the honking of the horns of the two vehicles upon reaching the spot where the killings were to take place showed deliberation and prior arrangement evidencing both a conspiracy and an intent to kill. The evidence also shows that it was Shedelbower who yelled at Romero when the latter went to stab Kim: "Make sure she's dead this time."

Citing such factors, the trial court held that the murder was "willful, premeditated, and there was deliberation involved." The trial court, thus, properly found that Shedelbower "knew what was going to take place" and the court further observed that it had "no feeling that he may have had some reservations." We likewise find that there is substantial evidence of defendant's specific intent to kill, sufficiently supporting the finding of special circumstances as true.

As further instructional error, defendants Dominick and Romero contend that the trial court should have instructed the jury sua sponte pursuant

to CALJIC No. 17.01.[25] Defendants contend that the instruction was required because: (1) the evidence did not establish whether it was Dominick or Romero who hit Danny in the throat with the pipe or pole, (2) as to Dominick there was evidence from the informant, Steven Copeland, that Romero snapped the murdered victim's head from side to side after the victim had been placed in the back of the station wagon, and (3) the victim's death could also have been caused from the act of the defendants in pushing him inside the station wagon over the cliff.

We find no error in the trial court's failure to so instruct inasmuch as the circumstances of this case at the very least fall within the "continuous crime" exception recognized by the state Supreme Court. (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971].) That exception applies where acts are "so closely connected in time that they formed part of one transaction." (*Ibid.;* see also *People* v. *Thompson* (1984) 160 Cal.App.3d 220, 224 [206 Cal.Rptr. 516].) Contrary to Dominick's assertion, this is not a case of "a continuous crime spree" as in *People* v. *Moore* (1983) 143 Cal.App.3d 1059, 1064-1065 [192 Cal.Rptr. 374], relied on by Dominick. That case involved shooting at an inhabited dwelling on three different occasions during a night and each shooting was perpetrated from a different vehicle. (*People* v. *Moore, supra,* at p. 1064.) Likewise, *People* v. *Hefner* (1981) 127 Cal.App.3d 88 [179 Cal.Rptr. 336], relied on by Romero is not on point. In that case, the court was concerned about "confusing testimony of the victims as to dates, times and sequence" and about the use of "'on or about'" where child abuse crimes were alleged approximately to have occurred over a six-month period. (*People* v. *Hefner, supra,* at pp. 91, 96-97.)

The murderous beating of Danny involving defendants here was followed immediately thereafter by an attempted murder of Kim. That second act was immediately followed up by pushing the murder victim's body over the cliff in a car. These acts were clearly "so closely connected in time that they formed part of one transaction" and hence, there was no requirement of instruction in the language of CALJIC No. 17.01.

Moreover, defendant Dominick's complaint appears to relate more to the question of proximate cause of the victim's death rather than to any jury requirement of unanimity of particular acts. The individual conduct of both defendants was clearly designed to kill Danny and to dispose of his body.

---

[25]CALJIC No. 17.01 (4th ed.) is worded as follows: "The defendant is charged with the offense of _____. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

The jurors were correctly and adequately instructed concerning the proximate cause of death.[26] There was no error.

## XI

### Great Bodily Injury Sentence Enhancements

 Defendants Romero and Shedelbower assign as error the enhancement of their sentences on the basis of the great bodily injury allegations found to be true pursuant to Penal Code section 12022.7. Romero's jury found true that he had inflicted great bodily injury upon the kidnapping victims, Danny H. and Kim M., in count II and that he inflicted great bodily injury upon Kim in count VIII, the attempted murder charge. The trial court, as trier of fact, likewise found Shedelbower had inflicted great bodily injury upon the victims of the kidnapping. We hold that the enhancements were applied properly to each defendant.[27]

 Citing the case of *People* v. *Moringlane* (1982) 127 Cal.App.3d 811 [179 Cal.Rptr. 726], Romero urges that one of the two great bodily injury enhancements must be stricken because section 654 of the Penal Code prohibits the imposition of two great bodily injury enhancements "when there is one indivisible transaction involving just one person."[28]

The flaw in Romero's argument lies in his assertion that the injuries here resulted from "one indivisible transaction." Although Kim M. was involved

---

[26]CALJIC No. 8.55 (4th ed. 1979) was given as follows: "To constitute murder . . . there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of that death. [¶] The proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred. [¶] There may be more than one proximate cause of a death. When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each is a proximate cause of the death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death."

[27]Penal Code section 12022.7 provides: "Any person who, with the intent to inflict such injury, personally inflicts great bodily injury on any person other than an accomplice in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of three years, unless infliction of great bodily injury is an element of the offense of which he is convicted. [¶] As used in this section, great bodily injury means a significant or substantial physical injury. [¶] This section shall not apply to murder or manslaughter or a violation of Section 451 or 452. The additional term provided in this section shall not be imposed unless the fact of great bodily injury is charged in the accusatory pleading and admitted or found to be true by the trier of fact."

[28]Romero questions the great bodily injury as it pertains to Danny H. asserting that section 12022.7 by its own terms "shall not apply to murder" and that such an enhancement allegation ought not to pertain to two victims. However, in view of our ruling that the great bodily injury enhancement was proper as to Kim M., we need not and do not reach these additional questions asserted by Romero.

as a victim of each of the enhancement allegations, she was clearly the victim of two separate assaults. The first occurred when she was held from behind and Romero hit her with the white pole. The consequence of that assault was that she fell down the hill, breaking her shoulder. According to her testimony, she lay there for approximately fifteen minutes until she was sure the three men had departed. It then took her five to ten minutes to climb up the hill after which she walked or half ran for approximately ten more minutes. At that point, Romero and a second man returned. On the second occasion she was stabbed some 20 times and again left for dead.

The court in *People* v. *Moringlane, supra,* 127 Cal.App.3d 811, dealt with a factual situation where the defendants shot at persons in one car inadvertently killing and wounding two persons in another car. The court held that the imposition of enhancements for the assaults of the two victims who had not suffered great bodily injury (the ones in the car the defendants had aimed at initially) violated the proscription of Penal Code section 654 against multiple punishments for a single act. The court held that this proscription applied to prohibit "the imposition of multiple enhancements for the single act of inflicting great bodily injury upon one person." (*People* v. *Moringlane, supra,* at p. 817.) The circumstances of the instant case are, however, otherwise. Although great bodily injury was inflicted upon one person, two separate sets of injuries were in fact inflicted and these on two separate occasions arising out of separate acts. Clearly, the multiple punishment prohibition of section 654 as applied in the *Moringlane* case is not applicable here. Hence, Romero's sentences were properly enhanced by two separate great bodily injury findings.

 Defendant Shedelbower's contention is that the evidence does not support application of the great bodily injury enhancement as to him. He relies on *People* v. *Cole* (1982) 31 Cal.3d 568, 572 [183 Cal.Rptr. 350, 645 P.2d 1182], which held that the language of section 12022.7 "is clear: the enhancement applies only to a person who himself inflicts the injury." Contending that in the infliction of the injuries to Kim M., he was no more than an aider and abettor, he asserts that the Supreme Court's decision in *Cole* prohibits the enhancement application here. We view it otherwise.

The trial court was plainly aware of the Supreme Court's holding in the *Cole* case which had been rendered over a year earlier. The court stated that "as far as the Penal Code section 12022.7, personally inflict, the court feels that defendant personally inflicted injury upon Daniel, as well as personally great bodily injury upon Kim, even though he was not the one that actually . . . swung the stick. The court feels that although it's not an aiding and abetting theory, he did grab her hair, pulled her back, at which time she was struck. It would appear to me that that is enough of a partic-

ipation in the injury that occurred to her that he would be responsible in her subsequently falling down the hill.'' Shedelbower specifically told police that he had held Kim by the hair on the back of her head so that she could be hit. After she was hit in the face, he related, ''she fell down into . . . the gulley.''

Viewing the evidence as we must in the light most favorable to the respondent and presuming in support of the judgment the existence of every fact the trier of fact can reasonably deduce from the evidence (*People* v. *Reilly, supra,* 3 Cal.3d 421, 425) we conclude that substantial evidence supports the trial court's finding that Shedelbower's acts constituted more than aiding and abetting and that he was directly responsible for the broken shoulder the victim suffered. Hence, his sentence was properly subject to such enhancement.

### XII, XIII*

. . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgments are affirmed.

Spencer, P. J., and Lucas, J., concurred.

Appellants' petitions for review by the Supreme Court were denied October 30, 1986.

---

*See footnote, *ante,* page 1174.