Filed 8/27/25  P. v. Romero CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B337005 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A800121) |
| v. | |
| STEVEN MICHAEL ROMERO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Alan K. Schneider, Judge.  Affirmed.

Robert H. Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

We affirm the resentencing court's order, brought by appellant Steven Michael Romero pursuant to Penal Code section 1172.6, denying his petition for resentencing.[1]  As a matter of law, he is ineligible for resentencing on his convictions for the murder of Daniel H. and the attempted murder of Kim M.  Relying on the instructions given to the jury at Romero's trial and the jury's verdict, we conclude the jury found all elements of murder and attempted murder as those crimes are currently defined.

## BACKGROUND

In 1983, Romero, Michael James Dominick, and Clifton Joseph Shedelbower were "convicted of the first degree murder of Daniel H. with special circumstances (witness killing and killing while engaged in flight from commission of rape and other felony crimes) (count I).[2]  They were also each convicted of kidnapping [of Daniel H. and Kim M.] (count II), rape [of Kim M.] (count IV), and oral copulation in concert [of Kim M.] (count VI).  In addition, Dominick was convicted of sodomy [of Kim M.] (count V) and Romero and Shedelbower were convicted of the attempted murder of Kim M. (count VII), who was the sex crimes victim.

---

[1] Undesignated statutory citations are to the Penal Code. We refer to the trial court that considered Romero's section 1172.6 petition for resentencing as the resentencing court.

[2] "After a severance was granted as to defendant Shedelbower, defendants Dominick and Romero were tried by separate juries in a joint trial.  Thereafter Shedelbower waived jury and his case was submitted on various transcripts, including the transcript of the co-defendants' trial." (*People v. Dominick* (1986) 182 Cal.App.3d 1174, 1182 (*Dominick*).)

Great bodily injury allegations were found true as to Romero and Shedelbower on the kidnapping and as to Romero alone on the attempted murder. On that latter charge, Romero was also found to have used a knife."[3] (*Dominick*, *supra*, 182 Cal.App.3d at pp. 1182–1183 [opinion in the appeal from Romero's convictions].)

The court sentenced Romero to state prison for life without the possibility of parole and to a determinate term of 31 years 8 months. (*Ibid*.) Romero's indeterminate term was for murder and his determinate sentence included a nine-year term for the attempted murder.

## 1. *Facts underlying Romero's conviction*

Romero provides no factual background or citations to the record. He merely refers to the factual background in our opinion in *Dominick*, and represents those are "the facts." The Attorney General too quotes excerpts from our factual presentation in *Dominick*. Only to give context to the jury instructions and the jury's verdict, we rely the pertinent factual summary in *Dominick*.

"In the early morning hours of Sunday, November 29, 1981, Kim M., [then]18 years old, and her 16-year-old friend, Danny H., the murder victim, drove in Kim's Datsun station wagon to a mountain-top location overlooking both the San Fernando Valley and the Saugus/Newhall area. In the vicinity were radar testing facilities operated by ITT Gilfillan Corporation (hereinafter ITT). These facilities had formerly been part of a Nike missile base and included a main facility designated as the Upper Loop Canyon

---

[3] Romero was the only defendant alleged to have used a knife in connection with the attempted murder of Kim M.

site and another facility containing missile silos at a nearby site called Lower Loop Canyon.  ITT employed 24-hour uniformed security guards who made rounds of the facilities in a white van. They operated from a guard house at the main ITT facility." (*Dominick*, *supra*, 182 Cal.App.3d at p. 1183.)

"Kim and Danny parked near the main facility at about 3 a.m. and within a few minutes a white van pulled diagonally in front of the station wagon.  A man wearing a dark jacket with a fur collar and a badge whom Kim later identified as Romero approached the station wagon and told the couple they were trespassing.  After Romero obtained identification from the two, a second man came toward them with a flashlight and asked if they had any weapons.  This man wore a green jacket with green pants and spoke with a southern accent.  Although Kim testified that Dominick was this man in green, other evidence at the trials showed that he was in fact Shedelbower." (*Dominick*, *supra*, 182 Cal.App.3d at p. 1183.)

"Romero told Kim and Danny to follow him so that he could check them out on 'the main computer' to insure they were not spies.  The couple then followed the white van down to the lower facility with the missile silos where one of the defendants unlocked a gate so the vehicles could be parked inside the fenced compound.  A third man, Dominick, whom Kim had not noticed until then, led Danny inside a nearby building.  Dominick was dressed in a dark fur-collared security jacket similar to Romero's but displayed no badge." (*Dominick*, *supra*, 182 Cal.App.3d at pp. 1183–1184.)

"Shedelbower and Romero, using a flashlight, then led Kim down into what was later determined to be an empty missile silo. As she was being led down some cement stairs, Kim hesitated,

4

and Romero swung a three-foot long white pole or pipe at her.  In fear she descended the remaining stairs, arriving in a large room with a cement floor.  Her glasses were removed and she was made to undress.  Shedelbower then fondled the victim [Kim] and forced her to orally copulate him, after which he raped her." (*Dominick*, *supra*, 182 Cal.App.3d at p. 1184.)  Romero then forced her to orally copulate him and raped her.  (*Ibid*.) "At about this time, Dominick appeared in the silo and he too forced Kim to orally copulate him.  Then he raped her and, following that, turned Kim on her stomach and sodomized her."  (*Ibid*.)

"Shedelbower told Kim she had 30 seconds to get dressed.  She was taken outside and placed in the rear of the white van.  A few minutes later Shedelbower removed her and placed her in her station wagon.  At this time Kim noticed Danny with his head and arms stuck through a ladder leaning against the building he had entered earlier.  She could not tell if Danny was tied to the ladder.  Romero was standing near him.  [¶]  Danny was then brought to the station wagon.  He was bleeding from the nose and slumped over the steering wheel.  Moments later he was made to sit on Kim's lap in the front passenger seat while Shedelbower drove the station wagon down the mountainside with the van leading the way.  After approximately 10 or 15 minutes, Shedelbower honked the horn and the van and station wagon stopped.  Shedelbower led Danny to the front of the van and Kim heard Romero tell him to 'lie down on the ground.'  Kim saw Romero make striking motions with what appeared to be the white pole she had seen earlier and heard the noise of Danny being struck.  Shedelbower, in the meanwhile, was standing beside Kim as she stood near the Datsun on the roadway.  She turned her head away from Danny and

Shedelbower asked her what she was thinking about. She replied that it was really cold out and they were going to kill her." (*Dominick*, *supra*, 182 Cal.App.3d at p. 1184.)

"Shortly Romero came toward her holding the white pole and stated, 'Now [it's] your turn.' Shedelbower got behind her and after taking hold of her by her arms, pulled her head back by her hair. As Romero swung the white pole at her in an apparent attempt to 'hit [her] throat,' she turned her head and screamed and a blow was struck to the right side of her face. At that moment, Kim somehow managed to break free and fell off the roadway partway down the mountainside.

"She heard a voice say, 'What did you let her go for?' and another voice replied, 'She broke free.' She heard someone say that they had to find her and then heard someone yell the name 'Mike.' Testimony at trial indicated that Romero used the first name of Steve, that Shedelbower used the first name of Cliff, and that Dominick used the first name of Michael or Mike. Kim lay on the hillside until one of the three men approached her and felt her arm, apparently for a pulse. She feigned lifelessness and the individual who had found her yelled up the hillside that she was dead and then departed. Moments later she heard voices saying that they would not drag her back up but would push the car off the cliff close to her to make it look as if she had fallen out. She also heard a voice say that Danny was not dead yet and someone else replied that 'they were going to kick the son-of-a-bitch to death." She then heard the men say to put Danny in the car and lock the doors." (*Dominick*, *supra*, 182 Cal.App.3d at p. 1185.)

"Kim lay . . . quiet for approximately 15 minutes and assumed that it was close to 5 a.m. The victim then struggled up the side of the mountain arriving on the roadway just as the sun

was coming up.  She was unable to spot the Datsun station wagon and so started down the roadway half walking and half running.  [¶]  After about ten minutes, she heard the sound of an engine and turned to see a white pickup truck coming up from behind.  She went over the side of the hill and slipped partway down to hide.  She heard one of two men ask if she needed help and then she saw a hand extended over the edge of the roadway to her.  Too late Kim, who was still without her glasses, realized to her horror that the two men were Romero and the man in the green clothing (i.e., defendant Shedelbower).  Romero had a sharp shiny object with which he stabbed her in the chest three times.  She fell backwards partially down the hillside once more.  She heard someone yell, 'Make sure she's dead this time.'  She then arose and began running and screaming down the hill further.  Near the bottom of that hill she stopped as Romero closed in on her and she asked him, 'to let me alone, let me die in peace.'  Romero put his arm down and said, 'I'd like to but I can't.'  Kim then became angry and started hitting him.  She related that she 'reached for his balls' and was 'trying to kick him.'  In this attempt, she fell forward and landed on her stomach.  At this point, Romero fell upon her and stabbed her 17 times in the back.  Romero left her there bleeding on the ground and she heard the pickup leave." (*Dominick*, *supra*, 182 CalApp.3d at pp. 1185–1186.)

On Tuesday night, Kim "managed to climb back up to the roadway and had begun walking down the mountain.  On her own, she arrived on the outskirts of Sylmar and went to a house where assistance was summoned.  She was taken by ambulance to Holy Cross Hospital where she remained for approximately two weeks.  There she was treated for the 20 stab wounds and for

7

a broken shoulder which she had sustained in falling down the mountainside. Her face was swollen. She suffered from numerous cuts and bruises and one of her lungs had partially collapsed. Dr. Howard Detwiler testified at trial that her stab wounds were life threatening. Dr. Celso Rodriguez further testified that Kim had suffered laceration and rupture of her hymen." (*Dominick*, *supra*, 182 Cal.App.3d at p. 1186.)

"In the meanwhile when Danny failed to return home by Sunday morning, his father reported him missing to the police. When the police were unable to provide any assistance, he chartered an airplane from which he spotted the wreckage of the Datsun station wagon down a ravine on the mountainside. Fire department personnel and police arrived at the wreckage site at approximately 5 p.m. on Sunday to find only Danny's dead body in the rear cargo area of the Datsun station wagon. The site of the wreckage was approximately two and a half miles from the Lower Loop Canyon ITT facility." (*Dominick*, *supra*, 182 Cal.App.3d at p. 1186.) "A deputy medical examiner performed an autopsy on the body of Danny and ascribed the cause of death to traumatic asphyxiation due to blunt force trauma injuries to the neck. He observed multiple abrasions and lacerations over the head and fractures of the cartilage in the neck. He also noted abrasions and bruises on the victim's hands." (*Id*. at p. 1187.)

## 2. *Jury instructions*

The trial court instructed Romero's jury that principals include: "1. Those who directly and actively commit [or attempt to commit] the act constituting the crime, or [¶] 2. Those who, with knowledge of the unlawful purpose of the person who directly and actively commits [or attempts to commit] the crime,

8

aid and abet in its commission [or attempted commission] and shares in the perpetrator's intent, or [¶] 3. Those who, whether present or not at the commission [or attempted commission] of the crime, advise and encourage its commission [or attempted commission], and share in the perpetrator's intent. [¶] One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged, and shared in the perpetrator's intent."

The jury instruction on natural and probable consequences was similar but not identical to the 1976 pattern instruction on the natural and probable consequences doctrine. The 1976 pattern instruction added to the definition of principals: " 'One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 263 [quoting the 1976 CALJIC No. 300].) Significantly, here, the trial court added to the pattern instruction the requirement that the aider and abettor knowingly aid and share in the perpetrator's intent.

The court also instructed the jury on aiding and abetting: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime, and shares in the perpetrators intent."

The court instructed the jury on the elements of murder, including that murder requires malice aforethought. The court

9

did not give an implied malice instruction. The court defined first degree murder as a "willful, deliberate and premeditated killing with express malice aforethought . . . ."

Regarding the special circumstance of the murder of a witness, the court instructed the jury that it had to find that if Romero was "not the actual killer," he "intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted, as previously defined, the actual killer in the commission of the murder in the first degree . . . ." The court instructed the jury that the special circumstance of murder of a witness to a crime required the jury to find that "the witness was intentionally killed for the purpose of preventing his testimony in a criminal proceeding."

With respect to attempted murder of Kim M., the court instructed the jury that one element was that "the attempt[ed] killing was done with malice aforethought." The court further instructed the jury: "An attempt to commit a crime of murder consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." The first degree attempted murder instruction provided: "All attempt[ed] murder which is perpetrated by any kind of willful, deliberate and premeditated attempt[ed] killing with express malice aforethought is attempt[ed] murder of the first degree."

As for great bodily injury in connection with the attempted murder, the court first informed the jury the prosecution alleged Romero "with the specific intent to inflict such injury personally inflicted great bodily injury" on Kim M. The court then instructed the jury that it had to find whether Romero "with the specific intent to inflict such injury, did personally inflict great

10

bodily injury . . . ."  With respect to the attempted murder count, the court further instructed on the personal use of a deadly weapon, "mean[ing] to display such a weapon in a[n intentionally] menacing manner or intentionally to strike or hit a human being with it."

## 3.    *Appeal from judgment of conviction*

On appeal from the judgment of conviction Romero argued, among other things, that the jury instructions failed to define aiding and abetting properly.  (*Dominick*, *supra*, 182 Cal.App.3d at p. 1203.)  Romero contended that under the then recent case, *People v. Beeman* (1984) 35 Cal.3d 547, a defendant could be convicted as an aider and abettor only if the defendant shared the specific intent of the perpetrator and aided the crime knowing the full extent of the perpetrator's criminal purpose.  (*Dominick*, at p. 1203.)

In rejecting Romero's argument that the trial court failed adequately to instruct the jury on intent, *Dominick* held to convict Romero of first degree murder, "jurors necessarily found that the murder was intentional and that each defendant 'manifested an intent unlawfully to kill' the victim."  (*Dominick*, *supra*, 182 Cal.App.3d at p. 1206.)  Further, even if the jury found Romero was an aider and abettor, under the aiding and abetting instructions the jury necessarily concluded that he "shared in the actual perpetrator's intent."  (*Ibid.*)  Additionally, to convict Romero of the special circumstance of murder of a witness to a crime "[t]he jury had to find that 'the witness was intentionally killed' (CALJIC [No.] 8.81.10 (4th ed.))."  (*Dominick*, at p. 1206.)  *Dominick* affirmed Romero's convictions.  (*Dominick*, at p. 1211.)

11

### 4.  *Petition for resentencing, opposition, and reply*

In April 2019, Romero filed a resentencing petition pursuant to former section 1170.95, now section 1172.6.  He alleged a complaint, information, or indictment was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine.  He also alleged he was convicted of murder based on the felony murder rule or the natural and probable consequences doctrine.  Romero did not allege he could not now be convicted of murder because of changes to sections 188 and 189 effective January 1, 2019.  Nevertheless, for purposes of this appeal, we deem him to have made such an allegation.[4]

The People opposed the petition, initially arguing the statute was unconstitutional.  The People also argued Romero intended to kill and was a major participant who acted with reckless indifference to human life.  The People filed a second opposition arguing Romero was ineligible for resentencing as a matter of law because the jury found he acted with intent to kill.

In reply, Romero argued he was not "barred from relief under section 1172.6 solely because his jury found true that he had the intent to kill."  Romero asserted the jury also had to find he aided and abetted the murder.  Finally, Romero asserted his jury was given "some instruction on the natural and probable consequences doctrine."

---

[4] On appeal, the parties appear to assume Romero alleged he could not now be convicted of murder or attempted murder because of changes to sections 188 and 189.

## 5. *Resentencing court order*

Although the petition concerned only the murder count, the resentencing court considered Romero's convictions for both murder and attempted murder. The court found Romero did not establish a prima facie case for resentencing relief. The court explained there was no instruction on felony murder or the natural and probable consequences doctrine. The court found the aiding and abetting instruction required Romero to have the mens rea and actus reus for murder and attempted murder.

## DISCUSSION

On appeal, appellant focuses on the instruction regarding the special circumstance for victim murder and argues the jury's true finding does not "conclusively" establish appellant had intent to kill. That instruction was relevant to the murder count; appellant makes no argument on appeal specifically directed to his attempted murder conviction.

To support his argument, appellant contends that at the time of Romero's conviction, the law was "unclear" until the Supreme Court decided *Carlos v. Superior Court* (*Carlos*)[5] as to whether the special circumstance instruction "at issue" required the jury to find intent to kill. He further contends, contrary to the resentencing court's finding, the trial court did instruct on the natural probable consequences and in combination with the

---

[5] *Carlos v. Superior Court* (1983) 35 Cal.3d 131, overruled by *People v. Anderson* (1987) 43 Cal.3d 1104, 1138–1139 [holding that intent to kill is not an element of the felony murder special circumstance but if the defendant is an aider and abettor and not the actual killer, intent must be proven in order to find the special circumstance true].)

unsettled state of the law, the jury could have convicted appellant based on imputed malice.  We review de novo the denial of a resentencing petition at the prima facie stage.  (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251.)  We conclude that the special circumstance instruction, which incorporates the aiding and abetting instruction, demonstrates the jury found all elements of murder as currently defined.  We also conclude that Romero is ineligible for resentencing on his attempted murder conviction because the jury found he was the principal—the person who stabbed Kim M. causing her great bodily injury.

## A.    Background on Section 1172.6

"[T]he Legislature, in Senate Bill 1437, 'eliminated natural and probable consequences liability for murder as it applies to aiding and abetting, and limited the scope of the felony-murder rule.' [Citation.]  Senate Bill 1437 also added section 1170.95, now section 1172.6, to provide 'a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief.' [Citation.]  Thereafter, Senate Bill 775 amended section 1172.6 to, inter alia, expand eligibility for resentencing to persons convicted of murder pursuant to a 'theory under which malice is imputed to a person based solely on that person's participation in a crime.' [Citation.]" (*People v. Antonelli* (2025) 17 Cal.5th 719, 723–724 (*Antonelli*).)  Senate Bill No. 1437 did not affect the direct theory of aiding and abetting. Accordingly, "[o]ne who directly aids and abets another who commits murder is . . . liable for murder under the new law just as he or she was liable under the old law." (*People v. Offley* (2020) 48 Cal.App.5th 588, 596.)

"[T]he section 1172.6 petitioning 'process begins with the filing of a petition containing a declaration that all requirements

14

for eligibility are met ([§ 1172.6], subd. (b)(1)(A)), including that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . Section 188 or 189 . . . ." ' [Citations.]" (*Antonelli*, *supra*, 17 Cal.5th at p. 724.) " 'If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition.' [Citation.]" (*Ibid*.)

In *People v. Curiel* (2023) 15 Cal.5th 433 (*Curiel*), our high court held a defendant who petitions for resentencing under section 1172.6 is ineligible for resentencing only if the "record conclusively establishes every element of the offense." (*Id*. at p. 463.) Thus, *Curiel* instructs that in evaluating whether a petitioner is eligible for resentencing at the prima facie stage, a court must view the instructions and verdict to determine whether the record of conviction shows every element of the offense.

**B.    As a Matter of Law, Romero Is Ineligible for Resentencing as to the Murder of Daniel H.**

" '[A] relevant jury finding is generally preclusive in section 1172.6 proceedings, i.e., it "ordinarily establish[es] a defendant's ineligibility for resentencing under Senate Bill 1437 and thus preclude[s] the defendant from making a prima facie case for relief." ' [Citation.]" (*People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, quoting *Curiel*, *supra*, 15 Cal.5th at pp. 453–454.) " 'Murder is the unlawful killing of a human being . . . with malice aforethought.' [Citation.]" (*People v. Richee* (2025) 111 Cal.App.5th 281, 293 (*Richee*).)

Either the jury found Romero was the actual perpetrator or it found he aided and abetted the murder. If the jury found Romero was the actual perpetrator of the murder, he would be

15

ineligible for resentencing, and Romero does not contend otherwise. Under the trial court's instructions, the jury necessarily found that the perpetrator killed Daniel H. with express malice, premeditation and deliberation, and with the intent to stop Daniel H. from testifying.

If, on the other hand, the jury found Romero aided and abetted the murder of Daniel H., we conclude the jury necessarily found all elements of aiding and abetting under current law. Our Supreme Court recently explained: " '[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another [e.g., murder] if the accomplice aids the commission of that offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends." ' [Citation.]" (*Curiel, supra*, 15 Cal.5th at p. 463.)

The trial court instructed the jury that to find the special circumstance true, it had to find that appellant "intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted, *as previously defined*, the actual killer in the commission of the murder in the first degree . . . ." (Italics added.) Thus, to find the special circumstance true, the jury necessarily had to have found that the aider and abettor aided the actual killer in the commission of murder in the first degree, i.e., willful, premeditated, and deliberate murder, and thus intended to kill. The special circumstance instruction incorporated the aiding and abetting instruction. The aiding and abetting instruction permitted the jury to find Romero aided and abetted only if it found that "with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such

16

crime, and shares in the perpetrators intent." If the jury found Romero was not the perpetrator, the jury instructions required that to convict him as an aider and abettor of the special circumstance murder, he had to have knowledge of the perpetrator's unlawful purpose while *sharing* the perpetrator's intent. Thus, the jury found all elements of direct aiding and abetting.

The trial court's natural and probable consequence instruction does not alter this conclusion. The court instructed the jury, "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged, and shared in the perpetrator's intent." As explained above, however, the jury could not have convicted Romero as an aider and abettor and found true the special circumstance regarding killing a witness without finding that Romero knew of the perpetrator's intent.

Assuming for purposes of argument only that the law at the time of Romero's trial was unclear as to whether an aider and abettor to a special circumstance murder had to have intent to kill, the jury instructions required the jury *in this case* to find Romero harbored intent to kill. Put simply, the trial court believed intent was required for aiding and abetting liability and instructed the jury accordingly. (See *Antonelli, supra,* 17 Cal.5th at p. 731 [jury instructions critical to evaluating section 1172.6 petition from defendant convicted by jury]; see also *Curiel, supra,* 15 Cal.5th at p. 441 [considering jury verdict in light of instructions to determine whether defendant made prima facie case for section 1172.6 relief].) As *Dominick* explained, the jury

17

instructions required the jury to find that Romero harbored intent to kill regardless of the state of the law at the time of his trial.  (*Dominick*, *supra*, 182 Cal.App.3d at p. 1206.)

 Romero also argues the jury could have imputed malice to him based on his participation in the kidnaping, rape, and oral copulation in concert "without also finding that Romero intended to kill."  No jury instruction permitted the jury to impute malice to Romero based on his crimes of kidnapping, rape, or oral copulation.

Finally, none of Romero's authorities assist him.  Romero relies on *Carlos* for the proposition that when Romero was tried, the law was undecided as to whether the special circumstance law required intent to kill.  *Carlos* is not apt.  There, our high court considered "whether a defendant can be charged or convicted of murder with the special circumstance of felony murder under the 1978 death penalty initiative if he did not intend to kill or to aid in the commission of a killing."  (*Carlos*, *supra*, 35 Cal.3d at p. 134.)  The court indicated the initiative "should be construed to require an intent to kill or to aid in a killing as an element of the felony murder special circumstance."  (*Id*. at p. 135.)  The court issued a writ barring trial on a special circumstance where no evidence suggested the defendant intended to kill the victim.  (*Id*. at p. 136.)

Romero also cites depublished appellate decisions for the proposition that "the 1978 initiative permitted the jury to impose death or life without the possibility of parole on an individual who neither killed nor intended to kill."  As set forth above, we have assumed arguendo the law was uncertain at the time of Romero's trial.  Still, under the trial court's actual jury

instructions, Romero's jury could not have found the special circumstance true without finding that he intended to kill.

Romero also relies on *People v. Warren* (1988) 45 Cal.3d 471. There, our high court considered the meaning of the following felony murder special circumstance instruction: " 'To find that the special circumstance, referred to in these instructions as murder in the commission of robbery, is true, it must be proved: [¶] 1a. That the murder was committed while the defendant was engaged in or was an accomplice in the commission of a robbery, or [¶] 1b. That the murder was committed during the immediate flight after the commission of a robbery, [¶] And it must also be proved: [¶] 2. That the defendant was either the actual killer or a person who intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of murder in the first degree.' " (*Id.* at p. 486.) The trial court also instructed the jury: " 'The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of robbery, and where there was in the mind of the perpetrator the specific intent to commit the crime of robbery, is murder of the first degree.' " (*Id.* at p. 487.) *Warren* held that a reasonable jury would understand the felony murder special circumstance instruction to mean the aider and abettor intended to kill. The high court rejected the argument that the aider and abettor instead could have intended only to commit a robbery. (*Id.* at pp. 487–488.) *Warren* is not apt because Romero's jury was not instructed on felony murder, as appellant concedes.

19

## C.    As a Matter of Law, Romero Is Ineligible for Resentencing for Attempted Murder

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]" (*Richee, supra*, 111 Cal.App.5th at p. 293.)  When viewed in light of the jury instructions, the jury verdict shows that the jury found Romero was the perpetrator because he used a weapon and personally inflicted great bodily injury on Kim M.[6]  Romero makes no separate argument that the jury's verdict and true finding on the witness murder special circumstance do not demonstrate the jury found intent to kill Kim M., and as explained above, the jury instructions and the jury's verdict and true finding would render any such argument unfounded.  In sum, as a matter of law, Romero is ineligible for resentencing on his attempted murder conviction.

---

[6] Shedelbower was also charged with the attempted murder of Kim M.  He, however, was not charged with personally using a knife in the commission of the crime. See footnote 3, *ante*.

20

## DISPOSITION

The order denying Steven Michael Romero's resentencing petition is affirmed.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.